IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERIC WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-3680-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of reassignment dated January 12, 2015, this case has been transferred for the conduct of all further proceedings and the entry of judgment. (doc. 20.)  Before the Court are *Plaintiff's Brief in Support of Claim*, filed February 25, 2015 (doc. 23), and *Defendant's Brief*, filed March 23, 2015 (doc. 24).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   Procedural History

Eric Williams (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits under Titles II of the Social Security Act.  (doc. 23 at 1.)  On September 14, 2011, he applied for disability and disability insurance benefits, alleging disability beginning October 8, 2010. (R. at 25.)   His application was initially denied on October 18, 2011, and upon reconsideration on January 23, 2012. (R. at 25, 71-72.)  He timely requested a hearing before an Administrative Law Judge (ALJ) on

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

February 3, 2012. (*Id.*)

Although his attorney was present, Plaintiff did not appear at the hearing on October 31, 2012. (R. at 55.) The ALJ issued a notice to show cause for his failure to appear and reset the hearing. (R. at 55-56, 170.) Plaintiff neither responded nor appeared at the second hearing on May 23, 2013. (R. at 61-62.) The ALJ considered his failure to appear as a constructive waiver of his right to a personal appearance at the hearing. (*Id.*) On July 23, 2013, the ALJ issued her decision finding him not disabled. (R. at 25-32.) Plaintiff requested review of the adverse findings by the Appeals Council on August 29, 2013. (R. at 21.) The Appeals Council denied his request for review on March 31, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at 9-11.) Plaintiff timely appealed to the United States District Court under 42 U.S.C. § 405(g). (doc. 1.)

**B.**     **Factual History**

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on March 24, 1973, and he was 40 years old at the time of the hearing. (R. at 63, 225.) He neither graduated from high school nor obtained a GED, and he did not attend any type of specialized job training or vocational school. (R. at 229.) His past relevant work included positions as a truck driver (906.683-022, medium, semi-skilled, SVP: 3), magazine delivery driver (292.363-010, light, semi-skilled, SVP: 4), and grounds keeper (406.684-014, medium, semi-skilled, SVP: 4). (R. at 30.)

    **2.**     **Medical, Psychological, and Psychiatric Evidence**

On October 10, 2010, Plaintiff was admitted to Baylor Medical Center at Irving (Baylor) with a cough. (R. at 295-56.) He reported to his doctors a past medical history of diabetes mellitus, hypertension, and high cholesterol. (R. at 296.) He also reported use of insulin, but he had not taken

2

multiple prescribed hypertension medications in six months. (*Id.*) He was examined by David D. Boltan, M.D., and Lindsay E. Boltan, M.D. (R. at 295-99.) He reported to the doctors that his cough had developed three days prior and was "associated with chills and sweats and some pleuritic pain with deep breath and coughing." (R. at 296.) "He also [reported] . . . some swelling in his ankles and legs[,] . . . [a] sore throat[,] and a dry feeling in his mouth." (*Id.*) The doctors observed that he appeared chronically ill and thin. (R. at 297.) The examination revealed that his congestive heart failure was exacerbated, and he was diagnosed with nephrotic syndrome, hypoalbuminemia, diabetes mellitus, high blood pressure, and prophylaxis. (R. at 297-98.) Plaintiff was put on a low dosage of ACE inhibitor and diabetic diet. (R. at 297.)

On October 10, 2010, Plaintiff had an echocardiogram, which reflected that he had congestive heart failure, diabetes, renal insufficiency, valvular dysfunction, and a heart murmur. (R. at 333.) Plaintiff also had a sonographic examination of his upper abdomen by Michael Stewart, M.D. (R. at 330.) Dr. Stewart found evidence of a right-sided pleural effusion, a small amount of ascites in the abdomen, multiple gallstones in the gallbladder with extensive thickening of the gallbladder wall, a normal spleen, and increased echogenicity of the kidneys bilaterally that was compatible with renal disease. (*Id.*)

On October 13, 2010, Jacob Chemmalakuzhy, M.D., performed a cardiac catheterization on Plaintiff. (R. at 301-03.) It revealed right heart hemodynamics consistent with severe pulmonary hypertension, extensive coronary disease involving the circumflex, severely depressed left ventricular function, severe aortic stenosis, and at least mild to moderate mitral senosis. (R. at 302.) Dr. Chemmalakuzhy diagnosed Plaintiff with congestive heart failure, cardiomyopathy, valvular heart disease with aortic stenosis/mitral stenosis, and pulmonary hypertension. (R. at 301.)

3

On October 14, 2010, Plaintiff was transferred from Baylor and admitted to UT Southwestern Medical Center in Dallas (UT Southwestern) for further evaluation and management. (R. at 351, 356, 445.) His attending physician was Joseph Mishkin, M.D. (R. at 352.) Once at UT Southwestern, Plaintiff had right and left heart catheterization, a carotid ultrasound, and an echocardiogram. (R. at 352.) He was diagnosed with acute heart failure, and open heart surgery was scheduled. (R. at 351.) After a pre-surgery examination, Carina Schwartz-Dabney, D.D.S., removed several of Plaintiff's teeth on October 18, 2010, to limit a significant risk of infection. (R. at 423-25, 1034-36.)

Plaintiff was discharged as stable from UT Southwestern on October 26, 2010. (R. at 351, 1212.) He was prescribed regular insulin (humulin r), asprin, atorvastatin (lipitor), carvedilil (coreg), clopidogrel (plavix), hydralazine (apresoline), isosorbide dinitrate (isordil), and furosemide (lasix). (R. at 353-54, 1037-1039.) Additionally, he was restricted to "[n]o heavy lifting, no extreme exertion [and a] . . . [l]ow cholesterol, low fat, ADA diet." (R. at 354, 1214.) Plaintiff was directed to follow-up with Dr. Mishkin on November 3, cease taking plavix on November 22, return on November 30 for a procedure to measure his heart pressure, and proceed to surgery on December 2, 2010. (R. at 354, 1039.)

Plaintiff met with Martha C. Jarmon, L.C.S.W., at UT Southwestern on November 3, 2010, regarding financial issues. (R. at 1354, 2080-88.) He also had a follow-up with Dr. Mishkin regarding his recent hospitalization. (R. at 1358.) Dr. Mishkin continued Plaintiff's medical management and noted that he "remain[ed] stable." (*Id*.)

Plaintiff again had a routine follow-up with Dr. Mishkin on November 17, 2010. (R. at 1365, 2089-96.) Dr. Mishkin noted that Plaintiff reported no chest pain, shortness of breath, orthopnea,

4

paroxysmal nocturnal dyspnea, palpitations, or lightheadedness. (*Id.*) Additionally, Plaintiff reported that his appetite was good, and Dr. Mishkin observed no neurological symptoms. (*Id.*) Dr. Mishkin continued Plaintiff's medical management. (R. at 1367.)

As planned, Plaintiff was admitted to UT Southwestern on November 30, 2010. (R. at 879, 2097-2517.) On December 2, 2010, Plaintiff had a right heart catheterization prior to surgery performed by Nikhil Munshi, M.D., Ph.D.m and Sarah Gualano, M.D. (R. at 1058-63.) No complications occurred. (R. at 1060.) Drs. Munshi and Gualano noted Plaintiff had moderate pulmonary hypertension with elevated PCWP and preserved cardiac output. (R. at 1063.)

On December 3, 2010, Plaintiff underwent an aortic valve replacement with a 21 mm St. Jude Medical aortic valve, a mitral valve replacement with a 29 mm St. Jude Medical mitral valve, and a coronary artery bypass grafting x1 with left internal mammary to the left anterior descending, conducted by Dan Marshall Meyer, M.D., Michael E. Jessen, M.D., and Shafi Mohamed, M.D. (R. at 495, 513, 544.) Following his surgery, Plaintiff recovered well. (R. at 560-61, 1460.) After physical therapy, Jashwanti Parbhoo, P.T., noted that Plaintiff's endurance and balance were good, and that he had progressed well with his recovery. (R. at 1436.) He was fully oriented and alert, and his doctors observed that he was "[d]oing well." (R. at 561, 582.) There were no complications from the surgery and he was discharged as stable on December 12, 2010. (R. at 496-97, 882-84.) Plaintiff was instructed to continue his medication of lipitor, humulin insulin regular, aspirin, and colace, and also to take coumadin, norco, humulin insulin 70/30, and coreg. (R. at 497.)

Plaintiff had a follow-up on December 15, 2010, with Dr. Mishkin. (R. at 1607, 2518-26.) Dr. Mishkin observed that Plaintiff appeared well-nourished, well-developed, and was not in apparent distress. (R. at 1609.)

5

Because of his prescribed medications, Plaintiff regularly visited the anticoagulation clinic at the UT Southwestern from December 2010 through July 2011. (R. at 1614-30, 1647-51, 1680-85, 1761-66, 1782, 1789, 1812, 1818, 1859, 1940.)

On January 12, 2011, Plaintiff had a follow-up with Dr. Mishkin. (R. at 1640.) Plaintiff's physical examination was normal, and Dr. Mishkin observed that Plaintiff's heart had a regular rate and rhythm. (R. at 1641.) He ordered Plaintiff admitted to outpatient cardiac rehabilitation on January 24, 2011. (R. at 1146-49.) Plaintiff's plan called for thirty-sessions over a twelve week period. (R. at 1156.) He attended only one of the thirty-six sessions, however. (R. at 1154-57.)

On February 8, 2011, Plaintiff was referred by Dr. Mishkin to the preventative cardiology program at UT Southwestern for his premature coronary artery disease and high Lp(a). (R. at 1656.) Plaintiff met with Anand Kumar Rohatgi, M.D. (*Id.*) Dr. Rohatgi noted that Plaintiff's hypertension was "still uncontrolled" and that he had high Lp(a) levels, but that his renal insufficiency was "improving." (R. at 1660.) Additionally, he noted that Plaintiff's bilateral obstructive carotid atherosclerosis was asymptomatic. (*Id.*) Dr. Rohatgi increased Plaintiff's lipitor to 80 mg, ordered NMR lipoprotein testing and TSH, and prescribed niaspan once Plaintiff acclimated to high-dose lipitor and blood testing was completed. (*Id.*)

Plaintiff was admitted to UT Southwestern on February 23, 2011 for a carotid endarterectomy to address a "known carotid obstruction." (R. at 729-30, 1686-1760.) He was operated on that day by Frank Robert Arko, III, M.D. and Sumona Smith, M.D. (R. at 744-45, 1053-55.) The doctors found severe focal stenosis in the proximal internal carotid artery. (R. at 745.) Dr. Arko observed no apparent complications, and Plaintiff awoke without any obvious neurological defects. (R. at 746.) Examinations of Plaintiff following the surgery noted that he was "doing well."

6

(R. at 752, 763.) Plaintiff was discharged on February 27, 2011. (R. at 729.)

On March 8, 2011, Plaintiff had a follow-up at Dallas Nephrology Associates for his chronic kidney disease. (R. at 856.) He met with Atinder Panesar, M.D., who conducted a physical examination. (R. at 857-58.) Plaintiff reported that he "[felt] poor[] in general but denie[d] shortness of breath with his current activity level" or chest pains. (R. at 856.) Dr. Panesar ran several tests and altered Plaintiff's medications. (R. at 858.) Later that day, Plaintiff also met with Wen S. Lai, M.D., at UT Southwestern to establish a primary care physician. (R. at 1767.) Plaintiff denied having hypoglycemia and reported to Dr. Lai that his blood sugars were all less than 120, and that he had right shoulder pain and possible nerve damage. (*Id.*)

Plaintiff met with Dr. Mishkin at UT Southwestern on March 9, 2011. (R. at 1773, 2546-55.) His chief complaint was "[l]eft neck pain - improved." (R. at 1773.) Dr. Mishkin observed that Plaintiff's lungs were clear and that his heart had a regular rate and rhythm. (R. at 1774.) He made no changes to Plaintiff's medication regimen. (R. at 1776.)

On March 30, 2011, Plaintiff met with Brenda Thompson, R.N., C.N.S., at UT Southwestern. (R. at 1796.) He reported shortness of breath and limitations during activity, fatigue, palpations, abdominal swelling, and cardiomyopathy. (*Id.*) Plaintiff's medication regime was maintained, except that his carvediol dosage was increased, and he was instructed to take norvasc at lunch and micardis at bedtime. (R. at 1800.)

Plaintiff again met with Dr. Panesar at Dallas Nephrology Associates for a follow-up on April 12, 2011. (R. at 860-64.) Dr. Panesar observed that Plaintiff's constitutional symptoms were normal; he experienced lower extremity edema, but no chest pain or intermittent leg claudication; his respiratory system was normal with no shortness of breath during exertion; and that his

7

genitourinary system was normal. (R. at 861.) Additionally, Dr. Panesar observed during a physical examination that the auscultation of Plaintiff's heart was abnormal, with a valve click and holosystolic murmur. (*Id.*) He further observed trace edema of both ankles of Plaintiff and no signs of respiratory distress. (*Id.*) Dr. Panesar increased Plaintiff's dosage of micardis and ordered him to maintain a low potassium diet. (R. at 862.)

Plaintiff followed up with Nurse Thompson at UT Southwestern on April 26, 2011, regarding his cardiomyopathy. (R. at 1824.) Nurse Thompson limited Plaintiff to upper body weight of twenty pounds because of the stress his heart was already under with reduced function. (R. at 1825.)

Plaintiff met with Dr. Rohatgi on May 3, 2011 at UT Southwestern. (R. at 1834.) Dr. Rohatgi diagnosed Plaintiff with pure hyperglyceridemia and non-ST segment elevation myocardial infarction. (*Id.*) Dr. Rohatgi instructed Plaintiff to reduce his intake of foods high in saturated fats, cholesterol, and trans fats and increase his exercise. (R. at 1838.)

On May 17, 2011, Plaintiff had another follow-up with Dr. Panesar. (R. at 865-68.) Dr. Panesar noted that Plaintiff's physical examination was normal, except for continued valve click along with systolic ejection murmurs. (R. at 866-67.) Dr. Panesar discontinued Plaintiff's carvedilol prescription and increased his micardis and insulin dosage. (R. at 868.)

On May 18, 2011, Plaintiff followed up with Nurse Thompson. (R. at 1849.) Nurse Thompson increased Plaintiff's carvedilol dosage to 1.5 tablets twice a day. (R. at 1853.)

On June 21, 2011, Plaintiff returned to UT Southwestern for a follow-up with Nurse Thompson. (R. at 1865.) Nurse Thompson directed Plaintiff to stop the norvasc and decreased his furosemide dosage. (R. at 1869.)

Plaintiff returned UT Southwestern for outpatient radiology imaging on June 24, 2011. (R.

8

at 926-32, 2556-68.) His renal ultrasound did not reveal any hydronephrosis. (R. at 1876.) He also followed-up with Nurse Thompson later that day. (*Id.*) She noted that his blood pressure had improved and that Plaintiff reported that he was "doing well." (*Id.*)

On July 9, 2011, Plaintiff was admitted to the emergency room at UT Southwestern with a diagnosis of HTN crisis palpitations. (R. at 804, 1026-29, 1896-1939.) He presented with a sensation of rapid heartbeats, which occurred in episodes that lasted on average three hours. (R. at 804-05.) He also presented with malaise/fatigue, irregular heartbeats, and weakness. (R. at 805.) He improved significantly and the symptoms resolved, so he was discharged in the early morning on July 10, 2011. (R. at 804, 811.)

On July 20, 2011, Plaintiff met with Nurse Thompson at UT Southwestern for a scheduled follow-up regarding his cardiomyopathy. (R. at 1091-97) She did not change his physical restrictions. (*Id.*)

On August 9, 2011, Plaintiff met with Dr. Panesar at Dallas Nephrology Associates regarding abnormal kidney functions. (R. at 870-73.) Dr. Panesar noted that Plaintiff's systems were normal, except for his gastrointestinal system. (R. at 871.) Additionally, Plaintiff's carotid pulses were "[a]bnormal," with a right carotid bruit. (R. at 872.) Plaintiff reported diarrhea, but no nausea, vomiting, abdominal pain, or melena. (R. at 871.) Dr. Panesar took Plaintiff off an ACE inhibitor, added sodium bicarbonate in the form of baking soda to his diet three times a day, liberalized his fluid intake, and checked his urine for protein excretion. (R. at 873.)

On October 19, 2011, Manda Waldrep, M.D., a state agency medical consultant, completed a physical residual function capacity assessment for Plaintiff. (R. at 2059-66.) Dr. Waldrep identified Plaintiff's primary diagnosis as chronic kidney disease with coronary artery disease status

post coronary artery bypass graft and hypertension. (R. at 2059.) She noted that the severity of alleged limitations were "partially supported." (R. at 2066.) She concluded that Plaintiff could lift and/or carry (including upward pulling) twenty pounds occasionally and ten pounds frequently and stand and/or walk (with normal breaks) a total of six hours in an eight hour day. (R. at 2060.) She further concluded that he had no other limitations on his ability to push and/or pull, and that he had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 2060-63.) Dr. Waldrep's assessment was affirmed as written by Randal Reid, M.D., an additional state agency medical consultant, on January 20, 2012. (R. at 2067.)

### 3. Hearing Testimony

Plaintiff did not appear at a hearing on October 31, 2012, and his attorney informed the ALJ that he had been unable to locate him. (R. at 55.) The ALJ issued a notice to show cause for failure to appear and reset the hearing. (R. at 55-56, 170.) Plaintiff neither responded to the notice to show cause nor appeared at the second hearing on May 23, 2013. (R. at 61-62.) At the second hearing, Plaintiff's attorney stated "I don't know where this man is. . . . he sort of fell off [a] cliff." (R. at 62.) The ALJ considered Plaintiff's failure to appear as a constructive waiver to his right to a personal appearance at the hearing, and proceeded to question the vocational expert (VE). (R. at 65-89.)

The VE testified that Plaintiff had past relevant work as a truck driver (906.683-022, medium, semi-skilled, SVP: 3), a magazine delivery driver (292.363-010, medium, semi-skilled, SVP: 4), and a groundskeeper (406.684-014, medium, semi-skilled, SVP: 3). (R. at 66.)

The ALJ asked the VE to consider a hypothetical person of the same age, education, and work history as Plaintiff. (R. at 67.) The hypothetical person was also limited to sedentary work with occasional bending, stooping, and crouching, and no squatting, kneeling, crawling, climbing,

10

or unprotected heights. (*Id.*) The ALJ asked the VE whether, given those limitations and restrictions, the hypothetical person could do any of Plaintiff's past relevant work or any other work that existed in significant numbers in the national economy. (*Id.* at 67-68.) The VE opined that the hypothetical person could not perform any of Plaintiff's past relevant work. (*Id.* at 67.) The hypothetical person could, however, work as a document preparer (249.587-018, sedentary, unskilled, SVP: 2), with 7,000 jobs in Texas and 97,000 in the national economy; telephone quotation clerk (237.367-046, sedentary, unskilled, SVP: 2), with 6,500 jobs in Texas and 84,100 in the national economy; and final assembler[2] (713.687-018, sedentary, unskilled, SVP: 2), with 12,500 jobs in Texas and 196,100 in the national economy. (*Id.* at 67-68.) The VE also opined that the hypothetical person would not be able to maintain competitive employment if he tended to miss work two to three days a month due to symptom flare-ups and the need for medical treatment. (*Id.* at 68.)

In response to a question by Plaintiff's attorney, the VE agreed that Plaintiff performed his past relevant work in the heavy range. (R. at 69.)

### C. ALJ's Findings

The ALJ issued her decision denying benefits on July 23, 2013. (R. at 25-32.) At step one, she found that Plaintiff had not been engaged in substantial gainful activity since October 8, 2010, the alleged onset date. (R. at 27.) At step two, she found that Plaintiff had the following severe impairments: ischemic cardiomyopathy secondary to combination of coronary artery disease and valvular heard disease with status post carotid endarterectomy, diabetes mellitus with chronic kidney

---

[2] The VE opined that Plaintiff could also perform any job within the office clerk category (which includes the document preparer position), and within the manufacturing and production jobs categories (which includes the final assembler position). (R. at 67-68.)

disease stage 3 from diabetic nephropathy. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in the regulations. (R. at 29.)

Before proceeding to step four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and that he could do occasional bending, stooping, and crouching, but he could not do work that requires squatting, kneeling, crawling, or climbing. (R. at 28.) He also had to avoid exposure to hazards, including working at unprotected heights. (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work. (R. at 30.) She found that transferability of job skills was not material to the determination, however, because Plaintiff was not disabled as the term is defined under the Social Security Act, before or after October 8, 2010, through the date of her decision (*Id*. at 30-31.)

## II.   ANALYSIS

**A.   <u>Legal Standards</u>**

    **1.   Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for

13

a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### B. <u>Issue for Review</u>

Plaintiff presents one specific issue for review:

Whether the ALJ failed to consider whether Plaintiff could maintain competitive employment.

### C. <u>Ability to Maintain Employment</u>

Plaintiff argues that the ALJ erred by failing to consider whether he was capable of maintaining employment for a significant period of time. (doc. 23 at 3-5.) He claims that "the ALJ's failure to assess and make explicit findings about [his] ability to maintain employment [in light of his recurring medical tests and treatment] constitutes reversible error in and of itself." (*Id.* at 5.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981). This requirement extends to cases involving mental as well as physical impairments. *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002). The requirement is not universal, however. *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). The ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period. *Id.* An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms." *See id.*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir.

15

2005). A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on the ability to maintain employment. *See Perez*, 415 F.3d at 465.

Here, Plaintiff has not identified evidence in the record of "waxing and waning" symptoms. (*See* doc. 23 at 1-6.) He merely concludes that his ability to maintain employment was "sufficiently questioned during the administrative hearing process" to require a specific finding. (doc. 23 at 4.) He further argues that "[his] medical conditions require him to frequently go to the hospital for laboratory tests and treatment which would interfere with his ability to hold a job for a significant period of time," and that "[t]he medical records in [his] case demonstrate[d] that [he] had multiple hospital admissions, laboratory appoints, and follow-up appointments that would be too excessive to maintain competitive employment." (doc. 23 at 3-4.)

Although the record shows a great deal of medical treatment when Plaintiff underwent heart valve replacement surgery and numerous follow-ups related to that surgery between October 2010 and August 2011 (R. at 296-2058), there is no evidence that an "excessive" amount of appointments will continue.[3] He provided no testimony or evidence related to the impact of his prior appointments or their expected impact in the future. (*See* R. at 53-70); *see, cf. McGhee v. Astrue*, No. 3:10-CV-424-BH, 2010 WL 2941204, at *9 (N.D. Tex. July 21, 2010) (relying on the nature of the

---

[3] Plaintiff submitted evidence to the Appeals Council that appears to identify several medical appointments between October 17, 2013 and June 10, 2014. (R. at 8.) Even considering this evidence, he has failed to show that this level of treatment was "excessive," or that these appointments will continue at an "excessive" pace in the future.

16

impairment, the medical evidence of record, treating physician opinions, the plaintiff's testimony, and the medical expert's testimony at the hearing to make a determination regarding whether a specific finding was necessary). Additionally, the medical records reflect that Plaintiff was recovering well from the surgery that prompted many of the medical appointments that occurred before the hearing. He did not present evidence that his ability to maintain employment was compromised. Under these circumstances, an express finding by the ALJ was not required, and substantial evidence exists to support the ALJ's decision.[4]

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 28th day of March, 2016.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[4] As in *Dunbar*, the ALJ here cited to both 20 C.F.R. § 404.1545 (2003) and SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996) in making her RFC determination. (R. at 27.) "Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.' " *Dunbar*, 330 F.3d at 672. Accordingly, the ALJ's decision also reflects that she considered Plaintiff's ability to maintain work in determining his RFC.